Opinion issued February
24, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00198-CV

———————————

CLEAR LAKE CITY WATER AUTHORITY, Appellant

V.

CLEAR LAKE COUNTRY CLUB, L.P.
and PlainfielD offshore holdings xi, inc., Appellees



 



 

On Appeal from the County Civil Court at Law No. 1

Harris County, Texas

Trial Court Case No. 890,796



 



 

O P I N I O N

 

          The Clear Lake City Water
Authority (“the Water Authority”) appeals the trial court’s judgment dismissing
its condemnation action in which the Water Authority sought to acquire a
178-acre defunct golf course owned by Clear Lake Country Club, L.P. (“the Country
Club”) for the purpose of constructing a storm water detention facility.  On appeal, the Water Authority raises three
issues with a number of sub-points.  We
address the following dispositive issue raised by the Water Authority: whether
the trial court erred when it denied the Water Authority’s motion for judgment
notwithstanding the verdict which challenged the jury’s findings that the Water
Authority’s determination to take the property for detention purposes was fraudulent
and arbitrary and capricious.

          We reverse and remand.

Background

          The Water Authority is a
water control and improvement district created pursuant to article XVI, section
59, of the Texas Constitution.  See Tex.
Const. art. XVI, § 59.  The Water
Authority’s responsibilities include the control and storage of storm and flood
water.  See Tex. Water Code Ann.
§ 51.121 (Vernon 2008).  To
accomplish its defined objectives, the Water Authority has the legislative
right to acquire land by condemnation.  See Tex.
Water Code Ann. § 49.222(a) (Vernon 2008).  

In the 1960s, Friendswood
Development Company, a company owned by Exxon Land Development, developed a master-planned
residential community in Clear Lake City. 
The community is located in the geographical district controlled by the
Water Authority.  The master-planned community
included a 178-acre tract of property (“the Property”) on which a golf course
was constructed.  Deed restrictions were
placed on the Property prohibiting it from being used as anything other than a golf
course or other recreational facility until the deed restrictions expire in 2021.  

          In January 2002, the Country
Club purchased the Property for $2.3 million. 
For the next several years, the Country Club operated the Property as a golf
course.  In early 2005, the golf course
became unprofitable.  The Country Club
announced that it would be closing the facility, seeking removal of the deed
restrictions, and selling the Property for residential and commercial
development.  

          In response to the
announcement, the Clear Lake City Civic League (the “Civic League”) a local
civic group, formed a subcommittee named the Green Space Preservation Committee
(the “Green Space Committee”) to oppose redevelopment of the Property and to preserve
it as a green space.  At the time, the
Water Authority’s board of directors (“the Board”) consisted of President Gayle
Yoder, Vice President John Branch (“Branch”), Secretary Bob Savely (“Savely”),
Vince Johnson, and John Ferguson.  See Tex.
Water Code Ann. §§ 49.051, 49.053, 49.102.  Two of the Water Authority’s directors,
Branch and Savely, were also co-chairs of the Green Space Committee.  

In the spring of 2005, Savely
presented to the Board a draft resolution providing that the Authority
unanimously and wholeheartedly supported the Green Space Committee’s mission.  The Board members generally indicated support
for the resolution but decided to have the Water Authority’s attorney review it.  A board vote was never taken on the
resolution.  

The Green Space Committee believed
that the abandoned golf course served as a de facto detention pond for the area
because, when it rained, water would pond on the Property.  In April 2005, Green Space Committee
co-chair, Katie Chementi, contacted Larry Dunbar, a licensed engineer-hydrologist
and attorney, to conduct a study to determine whether this theory was
correct.  Dunbar provided the Green Space
Committee with a proposed engagement agreement. 
The proposal indicated that the primary purpose of Dunbar’s work would
be to study the flooding conditions associated with two creeks running through
the Property and to determine the potential effect of developing the Property.  

Ultimately, the Green Space
Committee did not retain Dunbar. 
Instead, Dunbar was hired by the Water Authority as an engineering
consultant to provide hydrology services similar to those he had proposed to
the Green Space Committee.  In July 2005,
Dunbar prepared a report discussing the flooding associated with the two creeks
and regarding the effect of redeveloping the Property.  Nothing in Dunbar’s July report indicated a
need for regional detention ponds to be constructed.  The following month, an engineering firm
hired by the Country Club prepared a report regarding the drainage issues
associated with redeveloping the Property. 
The report indicated that construction of detention facilities on the
Property would alleviate any increased drainage resulting from redevelopment and
could help flooding in the area generally. 


In September 2005, Dunbar prepared
a report establishing more stringent standards for redevelopment of the
Property.  That same month, the Water
Authority amended its policies regarding drainage and flood for new development
to also apply to redevelopment of property. 


In October 2005, the Country Club
closed the golf course on the Property.  

At the request of the Board, Dunbar
conducted a broader study of flooding in the Water Authority’s district, specifically
flooding along Horsepen Bayou, the larger waterway into which the two creeks on
the Property flow.  A large portion of
the Horsepen Bayou watershed lies within the Water Authority’s boundaries.  

To alleviate flooding in the
district, Dunbar recommended that regional detention facilities be constructed
on the Property and also on another property south of Ellington Field.  Dunbar presented this recommendation to the
Water Authority at a November 10, 2005 board meeting in an oral report and in a
PowerPoint presentation.  

After Dunbar’s presentation, the
Board unanimously voted to pass a resolution (“the Resolution”) directing the
acquisition of the Property, and of the property near Ellington Field, by voluntary
acquisition or, if necessary, through condemnation proceedings, to establish storm
water detention facilities.  The text of
the Resolution indicates: (1) the Board had consulted with staff and
consultants to study existing flooding problems, (2) the Water Authority had received
information that substantial detention facilities were necessary to address the
Water Authority’s existing flood-prone conditions; (3) the two tracts
identified are “apparently available and currently unoccupied tracts of land
capable of accommodating such detention facilities in a manner most rationally
related to the needs of the locations;” (4) the detention facilities “would
mitigate current and future flooding problems in a number of subdivisions in
Clear Lake City within the [Water] Authority;” and (5) the establishment of the
flood control facilities will “significantly decrease current flooding
situations” and “will likely lower the high water condition of Horsepen Bayou
some two to three feet in 100 year flood events thereby reducing the downstream
impact.”

Dunbar and Branch met with the
Harris County Flood Control District and the City of Houston regarding the
detention facilities.  At the request of
those entities, Dunbar prepared a written report of his PowerPoint presentation
in September 2006.  

On November 13, 2006, the Country
Club filed suit against Exxon Land Development seeking to have the deed restrictions
on the Property, precluding residential and commercial development of the
Property, declared unenforceable (the “Exxon Suit”).  The Civic League and the Water Authority
intervened in the Exxon Suit.  The Water
Authority and the Civic League were represented in the suit by the same law
firm of Wilson, Cribbs & Goren, P.C.  

During the Texas Legislature’s 2007
session, House Bill 3232 (“HB 3232”), was introduced to address the
redevelopment of closed golf courses.[1]  HB 3232 required land formerly used as golf
courses to be subjected to heightened standards for re-platting, including (i)
special public hearings, (ii) findings regarding the sufficiency of
infrastructure, and (iii) super-majority approval from the respective
municipality if just 20 percent of adjacent homeowners protested the re-plat in
writing.  See Tex. Loc. Gov’t Code Ann.
§ 212.0155 (Vernon Supp. 2010).

When HB 3232 was scheduled for
hearing before the House’s Land and Natural Resources Committee, Branch
testified before the committee in support of the legislation.  Branch did so in his capacities as a
representative of the Water Authority and as a representative of the Civic
League.

On April 18, 2007, the Water
Authority filed a petition in the trial court seeking to obtain the Property by
condemnation.  The Water Authority
alleged that, since early 2005, it had engaged “in a deliberate and well
designed process to further reduce and, if possible, eliminate the events and
effects of flooding within its geographical boundaries.”  It asserted that, pursuant to the November
10, 2005 resolution enacted by its board, “the Property was designated as part
of acreage to be utilized to reduce and, if possible, eliminate flooding
conditions.”  The petition continues, 

 

The interest sought to be
acquired by [the Water Authority] in the Property will be used for a purpose
for which [the Water Authority] possess the power of eminent domain; namely,
the construction, maintenance, and operation of facilities for the purpose of
storm water detention to reduce and control flooding to the maximum extent
possible.

 

. . . .

[The Water Authority] and
the owner of the Property have been unable to agree on the value of the land or
the damages.  [The Water Authority] has
heretofore in good faith attempted to reach such agreement with [the Country
Club] and further attempts by [the Water Authority] to agree with [the Water
Authority] would be futile.  Therefore,
[the Water Authority] has no recourse but to seek condemnation of the Property.

 

          The trial court appointed three
special commissioners to determine the value of the Property.  Following a hearing, the commissioners found
that the market value of the Property was $14,132,000.  The Water Authority filed an objection to the
commissioners’ award asserting that “the amount of the damages awarded by the
Special Commissioners is grossly excessive in that it requires [the Water
Authority] to pay [the Country Club] far more than the fair market value of the
land taken.”  The Water Authority further
asserted that the commissioners “failed to take into account the Deed
Restrictions upon the lands being condemned.” 
The Water Authority requested “that this cause be tried and determined .
. . as in other civil cases.”  

          The case was set for a
jury trial.  Before trial, the trial
court determined, as a matter of law, that the purpose for condemning the
Property—to establish storm water
detention facilities—was a public
use.  The trial court also determined, as
a matter of law, that the Water Authority’s Board had determined that a public
necessity existed to take the Property to establish water detention facilities.
 

Although the parties stipulated that
all statutory prerequisites to condemnation had been satisfied, the Country
Club asserted, as affirmative defenses, that the Water Authority’s
determination that it was necessary to acquire the Property for detention
purposes was fraudulent and arbitrary and capricious.  At trial, the Country Club argued and offered
evidence to show that the true reason for the Water Authority’s condemnation
was not storm water detention but to prevent redevelopment of the Property.  

          The trial lasted for one
month.  At the charge conference, the
Water Authority offered numerous objections to the jury charge.  Among the objections was the Water
Authority’s argument that the Country Club had to meet a heightened evidentiary
burden of proof to prevail on its allegations of arbitrariness and fraud.  The Water Authority asserted that the extent
to which property is taken by condemnation is a legislative question, not a
judicial one, thus implicating separation of powers concerns.  The Water Authority also objected to a number
of the trial court’s definitions and instructions, including the trial court’s
definition of fraud and arbitrariness.  

The jury ultimately agreed with the
Country Club, finding that the Water Authority had acted fraudulently and
arbitrarily when it decided that the Property should be taken for the purpose
of constructing a storm water detention facility.  The jury also determined that the fair market
value of the Property was $5,100,000.  The
jury further found that the Country Club had incurred $1,188,000 in attorney’s
fees, $126,000 in appraiser’s fees, and in $116,000 in “other expenses.”  

The Water Authority filed a motion
for judgment notwithstanding the verdict (JNOV) asserting that no evidence
supported the jury’s findings that the Water Authority had acted fraudulently
and acted arbitrarily and capriciously when it made its determination to acquire
the Property.  The trial court denied the
motion.

          Based on the jury’s
verdict, the trial court rendered judgment dismissing the Water Authority’s
condemnation proceeding and awarding the Country Club $1,430,000, the sum of
its attorney’s and appraiser’s fees, and other expenses.  This appeal followed.  On appeal, the Water Authority raises three
issues containing a number of sub-points.[2]  

Denial of the Water Authority’s Motion
for JNOV

Among its appellate challenges, the
Water Authority asserts that the trial court erred when it denied its motion
for JNOV.  The Water Authority asserts
that legally-insufficient evidence supports the jury’s findings that it acted
fraudulently and arbitrarily and capriciously when it determined that
condemnation of the Property was necessary for storm water detention.  

A.      Governing Legal Principles 

          1.       Standard
of Review

A trial court may disregard a jury’s findings and grant a motion for
judgment notwithstanding the verdict only when a directed verdict would have
been proper. See Tex. R. Civ. P. 301; Fort Bend County Drainage Dist. v. Sbrusch,
818 S.W.2d 392, 394 (Tex. 1991); B & W Supply, Inc. v. Beckman, 305
S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  We review challenges to a trial court’s
ruling on a motion for JNOV under the same legal-sufficiency test applied to
appellate no-evidence challenges.  See Tanner v. Nationwide Mut. Fire Ins. Co.,
289 S.W.3d 828, 830 (Tex. 2009); City of
Keller v. Wilson, 168 S.W.3d 802, 822-23, 827 (Tex. 2005).  Applying that standard, we consider the
evidence in the light most favorable to the verdict and indulge every
reasonable inference that would support it.  City of
Keller, 168 S.W.3d at 822.  We credit
favorable evidence if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not.  Tanner, 289 S.W.3d at 830.  We also must be cognizant that, “[e]ven though
the evidence is viewed in the light most favorable to the verdict, it cannot be
considered in isolated bits and pieces divorced from its surroundings; it must
be viewed in its proper context with other evidence.”  AutoZone,
Inc. v. Reyes, 272 S.W.3d 588, 592 (Tex. 2008) (citing City of Keller, 168 S.W.3d at 827) 

If more than a scintilla of probative evidence supports the finding, the
legal sufficiency challenge fails.  Coastal Transp. Co. v. Crown Cent. Petroleum
Corp., 136 S.W.3d 227, 233 (Tex. 2004).  More than a scintilla of evidence exists when
the evidence “rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.”  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994).  In contrast,
evidence that creates no more than “a mere surmise or suspicion of its
existence” is only a scintilla and, thus, no evidence.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983)).      

2.       Relevant
Condemnation Law

The applicable eminent domain
statute in this case provides,

A [water] district . . . may
acquire by condemnation any land, easements, or other property inside or
outside the district boundaries . . . necessary for water, sanitary sewer,
storm drainage, or flood drainage or control purposes or for any of its
projects or purposes, and may elect to condemn either the fee simple title or a
lesser property interest.

 

See Tex. Water Code Ann. § 49.222(a).

With regard to condemnation
generally, a governmental entity may prevail on an eminent domain claim only if
the condemnation is for a “public use.”  Whittington v. City of Austin (“Whittington
I”), 174 S.W.3d 889, 896 (Tex. App.—Austin 2005, pet. denied).  “There
are two aspects to the ‘public use’ requirement.  First, the condemnor must intend a use for the
property that constitutes a ‘public use’ under Texas law.  Second, the condemnation must actually be
necessary to advance or achieve the ostensible public use.”  Id.  

We have previously recognized, “The
condemnor’s discretion to determine what and how much land to condemn for its
purposes—that is, to determine public
necessity—is nearly absolute.”  Malcomson
Road Util. Dist. v. Newsom, 171 S.W.3d 257, 268 (Tex. App.—Houston [1st
Dist.] 2005, pet. denied).  When, as
here, a statute vests a governmental entity with discretionary authority to
condemn, the entity’s determination of public necessity is presumptively
correct, absent proof by the landowner of the entity’s fraud or proof that the
condemning authority acted arbitrarily or capriciously in its condemnation of
the property.  See FKM P’ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.,
255 S.W.3d 619, 629 (Tex. 2008); see also
Hous. Auth. of City of Dallas v. Higginbotham,  143 S.W.2d 79, 88 (Tex. 1940) (“The law is
well established in this state that where the power of eminent domain is
granted, a determination by the condemnor of the necessity for acquiring
certain property is conclusive in the absence of fraud.”); Whittington I, 174 S.W.3d at 898 (explaining that once presumption
of necessity arises, landowner can contest fact of necessity only by
establishing affirmative defenses such as fraud, bad faith, or arbitrariness).  In short, without a showing that the
condemnor acted fraudulently, in bad faith, or arbitrarily, the presumption
that the taking was necessary is conclusive. 
See Anderson v. Teco Pipeline Co.,
985 S.W.2d 559, 565 (Tex. App.—San Antonio
1998, pet. denied).

Whether the condemnor acted
fraudulently, in bad faith, or arbitrarily is a fact question that may properly
be decided by a jury.  See id. at 566.  Because they are affirmative defenses, the
landowner has the burden to show that the condemnor acted arbitrarily or
fraudulently.  See Malcomson Road Util. Dist., 171 S.W.3d at 269 (citing Ludewig v. Houston Pipeline Co., 773
S.W.2d 610, 614 (Tex. App.—Corpus
Christi 1989, writ denied) and Snellen v.
Brazoria County, 224 S.W.2d 305, 310 (Tex. Civ. App.—Galveston 1949, writ ref’d n.r.e.)).  The landowner can only establish these
affirmative defenses by negating “any reasonable basis” for determining what
and how much land to condemn.  See id.; Wagoner v. City of Arlington, 345 S.W.2d 759, 763 (Tex. Civ. App.—Fort Worth 1961, writ ref’d n.r.e.).  

With these principles in mind, we
review whether the trial court erred when it denied the Water Authority’s
motion for JNOV.  

B.      Analysis

          The Water Authority
contends that the evidence is legally insufficient to support the jury’s
findings that its decision to condemn the Property was fraudulent and arbitrary
and capricious.  With respect to whether
the Water Authority acted arbitrarily and capriciously, the jury was asked, “From
a preponderance of the evidence, do you find that the Water Authority’s action
in determining to take the Property for detention purposes was arbitrary and
capricious?”  The jury was instructed, “‘Arbitrary
and capricious’ means willful and unreasoning action, action without consideration
and in disregard of the facts and circumstances that existed at the time
condemnation was decided upon, or within the foreseeable future.”  The jury responded affirmatively.

With respect to whether the Water
Authority acted fraudulently, the jury was asked, “From a preponderance of the
evidence, do you find that the Water Authority’s action in determining to take
the Property for detention purposes was fraudulent?”  The jury was instructed, “‘Fraudulent’ means
any act, omission or concealment, which involves a breach of legal duty, trust
or confidence, justly reposed, and is injurious to another, or by which an
undue and unconscientious advantage is taken of another.”[3]  Again, the jury responded affirmatively.

To support
its affirmative defenses, the Country Club offered evidence that can be divided
into three general categories: (1) evidence that Dunbar’s recommendation to
construct storm water detention facilities on the Property lacked a sound basis
in hydrological engineering; (2) evidence that the Water Authority lacked the
financial information and funding to construct the detention facilities; and
(3) evidence, including statements attributable to the Water Authority and its
Board members, showing that the Water Authority desired to prevent
redevelopment of the Property.  We
discuss each category of evidence in turn. 


1.       Dunbar’s Recommendation 

The Water Authority asserted that it based its decision to
condemn the Property for the purpose of storm water detention on the
recommendation and analysis of professional engineer and hydrologist Dunbar,
whom the Water Authority had hired as a consultant regarding flooding issues
within its district.  Thus, to show that
the Water Authority acted arbitrarily or fraudulently when it decided to take
the Property, the Country Club was required to show that it did not have a reasonable
basis to rely on Dunbar’s recommendation. 
See Malcomson Road Util. Dist., 171 S.W.3d at 269; Wagoner,
345 S.W.2d at 763.  In other words, if it
was reasonable for the Water Authority to follow Dunbar’s recommendation
regarding taking the Property for storm water detention, then the Water
Authority did not act arbitrarily or fraudulently.  See Malcomson
Road Util. Dist., 171 S.W.3d at 269; Wagoner,
345 S.W.2d at 763.  

          At trial, the evidence showed that
land within the Water Authority’s boundaries lie within either the 100-year or the
500-year flood plain.  Nearly 4,000 of
the residences in the district lay within the 500-year flood plain.  The evidence further showed that residential
flooding has occurred within the district and is a continuing concern.  

It is not disputed that the Water Authority has not only the
right, but the duty to take action to control flood waters within its
boundaries.  See Tex. Water Code Ann. § 51.121; see also Tex. Water Code
Ann. § 49.222.  In this
regard, the jury in this case was instructed as follows:

The Water Authority has the right and duty to control
flood waters.  Since the power to control
flood waters exists, it carries with it the usual established and well
recognized methods of control.  One such
method is storage reservoirs or retarding basins for impounding flood waters, controlling
the streams and preventing floods.

 

As mentioned, Dunbar gave an oral report along with a
PowerPoint presentation to the Water Authority at the November 10, 2005 board
meeting.  In his presentation, Dunbar
recommended that the Property be used as a storm water detention facility to alleviate flooding in the district.  Following Dunbar’s presentation, the Board
passed the Resolution to obtain the Property to construct storm water detention
facilities.

During his presentation to the
Board, Dunbar showed maps from the Tropical Storm Allison Recovery Project
depicting the extent of the 100 and 500 year flood plains of Horsepen Bayou, an
area that lies within the Water Authority’s district.  Dunbar indicated that 1,727 acres of storage
capacity for storm-water runoff could be created by converting the 178-acre
golf course into a series of interconnected detention ponds.  

The evidence showed that Dunbar
presented a general description of the configuration of the proposed detention ponds.
 He explained to the Board that the Property
would be excavated to an average depth of 11 feet, with three-to-one side
slopes.  Dunbar further explained that
2,047 acres of surface area would drain into the ponds.  Using the maps as visual aids, Dunbar showed
how the area would drain into the detention ponds.  He told the Board that the golf course pond
system would reduce flows into Horsepen Bayou downstream of El Dorado Boulevard
by 2,500 cubic feet per second, or 20 percent. 
This would reduce 100-year flood levels in Horsepen Bayou by
approximately 1.5 feet and in Armand Bayou, into which Horsepen Bayou flows, by
approximately 2,300 cubic feet per second, or by 10 percent.

          At trial, the Country Club offered the
testimony of Andrew Yung, its engineering hydrologist expert.  Yung had experience in both the public and
private sector working in the field of hydrology, including public sector experience
planning regional detention basins.  

Yung reviewed numerous documents, including Dunbar’s reports
and his PowerPoint presentation, to analyze whether the Water Authority’s
determination to condemn the Property for storm-water detention was supported
by sound engineering analysis.  For a
number of reasons, Yung concluded it was not. 
In support of his conclusion, Yung noted that the properties in the
vicinity of the golf course are outside the 100-year floodplain.  He pointed out that Dunbar’s July 2005 report
demonstrated that the neighborhoods around the Property experience flooding due
to inadequate storm-sewer systems, not lack of detention capacity.  According to Yung, Dunbar provided no
analysis quantifying the benefits of a regional detention facility to the areas
surrounding the Property.  

          Yung also stated that Dunbar’s reports
were inadequate because they were conceptual only.  Yung opined that the reports did not contain
information justifying the need for the proposed detention facilities or the
type of project detail agencies ordinarily would require before initiating the
acquisition of property for detention purposes.  Yung testified that the Dunbar’s reports lacked
analysis regarding the design of hydraulic structures necessary to divert
drainage of 1,649 acres uphill from one of the creeks on the Property and lacked
evidence that the county flood control district would authorize such a
diversion.  Yung further opined that
Dunbar’s analysis lacked any hydraulic analysis to support his assertions
regarding the impact that the proposed detention facilities would have on the
100-year floodplain and flood levels along Horsepen Bayou. 

On appeal, the Country Club also points out that Dunbar’s own
trial testimony shows that his PowerPoint presentation and September 2006,
report did not address (i) the necessary drainage interconnections, (ii) the
drainage design to allow water to drain uphill, (iii) the drainage conduit to
connect detention facilities across El Dorado Boulevard, and (iv) the drainage
outlet structures to connect the detention to the Harris County Flood Control
District’s ditches.  Dunbar also
testified that he did not estimate the cost of the detention facility for the
Water Authority, and he did not prepare specific designs for the detention facility.  

          Yung also testified that the detention
facility would benefit only 15 to 20 homes along Horsepen Bayou.  He believed that the better, more
cost-efficient option would be to buy out these homes.  For this reason, Yung characterized the Water
Authority’s decision to construct the detention facility on the Property as
“excessive.”  

          In contrast, Dunbar, Branch, and
another hydrology expert, Dr. Philip Bedient, a professor at Rice University,
hired by the Water Authority, opined that the “conceptual plan” presented by
Dunbar to the Board was sufficient to support the decision by the Water
Authority to obtain the Property for construction of a detention facility.  To address Yung’s criticism that Dunbar had
not done a hydraulic study of Horepen Bayou to support his recommendation, Dr.
Bedient testified that the type of study Yung claimed was needed would cost the
Water Authority several hundred thousand dollars and was unnecessary to support
the Water Authority’s decision.  

          A difference in opinion between the Country
Club’s hydrology expert and the Water Authority’s experts regarding what
constitutes a sufficient basis in engineering to support the Board’s Resolution
to take the property for detention purposes does not support a finding that the
Water Authority acted in a arbitrary or fraudulent manner.  When “there is room for two opinions, an
action cannot be deemed arbitrary when it is exercised honestly and upon due
consideration, regardless of how strongly one believes an erroneous conclusion
was reached.”  Ludewig, 773 S.W.2d at 614; see
Meaney v. Nueces County Navigation Dist.
No. 1, 222 S.W.2d 402, 405, 408 (Tex. Civ. App.—San Antonio 1949, writ ref’d)
(explaining with regard to determining whether condemning authority’s action
was arbitrary and fraudulent that “mere differences of opinion do not raise
fact issues for a jury in cases of this character”); Wagoner, 345 S.W.2d at 764 (“Neither may it be stated that in said
connection a condemnee has met the requisites of proof sufficient to present a
judicial issue where the record shows that there was room for two opinions, at
the time the condemning authority determined upon the basis of one of such
opinions that the land sought should be condemned.”).  

          The record shows that the Water
Authority hired Dunbar as a consultant regarding flooding issues.  In July 2005, the Water Authority asked
Dunbar to expand the scope of his work beyond the Property and address flooding
concerns along Horsepen Bayou.  As part
of his assignment, Dunbar made recommendations to the Board regarding how to
address the flooding problems in the district. 
Dunbar testified that constructing the detention facility on the
Property was his idea.  He believed that
it was the best solution to address the flooding problems.  On November 10, 2005, Dunbar made a
presentation to the Board at which he explained the benefits of building the
detention facility on the Property.  After
listening to the presentation, the Board voted to adopt the Resolution
authorizing the taking of the Property for storm water detention.  The Country Club’s evidence questioning the
soundness of the underlying engineering analysis does not show that the Water Authority’s
reliance on the Dunbar’s recommendation was not rational or legitimate.

          No evidence was presented that the
detention facilities will not benefit the constituents of the Water Authority’s
district.  Rather, the Country Club,
through Yung, asserts that the taking of the property is “excessive” in
comparison to the benefit reaped.  Contrary
to the Country Club’s position, a showing that alternate plans are feasible or
better does not make the condemnation determination fraudulent or arbitrary or
capricious.  See Zboyan v. Far Hills Util. Dist., 221 S.W.3d 924, 930 (Tex. App.—Beaumont 2007, no pet.); Ludewig, 773 S.W.2d at 614; Wagoner, 345 S.W.2d at 763.  Courts afford broad discretion to those in
whom the power of eminent domain is vested.  See Pizzitola
v. Houston Indep. Sch. Dist., No. 13-05-249-CV, 2006 WL 1360838, at *4
(Tex. App.—Corpus Christi May 18, 2006, no pet.) (mem. op.) (citing Webb v. Dameron, 219 S.W.2d 581, 584
(Tex. Civ. App.—Amarillo 1949, writ ref’d n.r.e.)).  When property is taken for a legitimate
reason, the taking is not arbitrary even if the possibility of utilizing the
purpose for which it is taken is “remote.” 
See Ludewig, 773 S.W.2d at 614–15
(upholding trial court’s decision to disregard jury’s arbitrariness finding
against condemnor when property taken for legitimate purposes of maintenance,
even though condemnor admitted that needing to conduct maintenance likely a
remote possibility). 

There is also no evidence that the Water Authority has ever admitted
that the Property is not needed as a detention facility or that it has no
intention of using the Property for storm water detention.  In this regard, this case is distinguishable
from others in which jury findings of arbitrariness or fraud have been
upheld.  See, e.g., City of Austin v. Whittington (“Whittington II”), No.
03-07-00729-CV, 2010 WL 567153, at *3 (Tex. App.—Austin Feb. 18, 2010, pet.
filed) (mem. op.) (affirming jury findings of arbitrariness and fraud when
condemning authority’s representative had admitted in a letter that taking of
property was not necessary for purpose for which it was taken); City of Houston v. Hamons, 496 S.W.2d 662, 664–65 (Tex. Civ. App.—Houston [14th Dist.]
1973, writ ref’d n.r.e.) (holding evidence sufficient to support jury’s
arbitrariness finding when city officials admitted that city had no intent to
use condemned property for expressly stated purpose for which it was taken). 

2.       Funding and Feasibility of the Detention
Facilities

        To
support its affirmative defenses of fraud and arbitrariness, the Country Club relied
on evidence showing that the Water Authority had not been informed of the potential
construction and engineering costs associated with building the proposed
detention facilities before passing the Resolution to acquire the Property.  The Country Club also pointed out that the
Water Authority did not have the $19 million estimated by Yung to complete the
detention project.  The Country Club
further cited evidence that the Water Authority had not obtained approval or
permits from the county flood control district or the City of Houston regarding
the drainage plan or the use of existing structures integral to the detention
project.  

          Again, we must view evidence in its proper context with other evidence; evidence cannot
be considered in isolated bits and pieces divorced from its surroundings; it
must be viewed in its proper context with other evidence.  AutoZone,
272 S.W.3d at 592 (citing City of Keller,
168 S.W.3d at 827).  Here, Branch
testified that the Water Authority issues bonds to fund its “large capital
projects.”  Branch testified that the
Water Authority has had no difficulty in funding other improvement projects
costing even more than the proposed detention facility.  He testified that the Water Authority has the
ability to fund the detention project at issue. 
The Country Club offered no evidence to prove otherwise.  Simply showing that the Water Authority was
unaware of the cost of the detention project at the time of the Resolution’s
passage is not evidence of fraud or arbitrariness.  See Pizzitola,
2006 WL 1360838, at *4 (holding that landowner’s showing that condemning
authority failed to allocate specific funds for acquisition of property before
deciding to take property was not evidence that decision to take property was
arbitrary and capricious).  

          Evidence was presented
that it is standard practice for Harris County and federal entities charged
with flood control to receive a cost estimate before approving the acquisition
of the land needed for the detention facility. 
However, this evidence, suggesting an industry standard, does not
address the circumstances of this case specifically enough to constitute
evidence that the Water Authority acted fraudulently or arbitrarily.  See Circle
X Land & Cattle Co., Ltd. v. Mumford Indep. Sch. Dist., 325 S.W.3d 859,
868 (Tex. App.—Houston [14th Dist.] 2010, no pet. h.) (holding, in summary-judgment
context, that landowner’s evidence of industry standard, which failed to
specifically discuss circumstances of case at hand, did not raise material
raise fact issue concerning whether condemning authority had acted in arbitrary
and capricious manner).  

          In addition, courts have explained
that it is not arbitrary or capricious to base a condemnation on a reasoned
prediction of future need or demand.  See id; Pizzitola, 2006 WL 1360838, at *5.  It follows that evidence that the Water
Authority had not secured the necessary permits or permission from other
governmental agencies to construct the detention facility is not evidence that its
condemnation decision was fraudulent or arbitrary and capricious.  

3.       Evidence of the Water Authority’s Desire
to Stop Redevelopment

          At trial, the Country Club argued that
the Water Authority’s true motivation for condemning the Property was to
prevent its redevelopment and to preserve the Property as a green space.  In support of this theory, the Country Club places
particular significance on a February 2007 engagement letter from an attorney
at Wilson, Cribbs & Goren,
the firm representing the Civic League and the Water Authority in the Exxon
Litigation.  As mentioned, the Water
Authority and the Civic League intervened in the suit to prevent the Country
Club from succeeding in the removal of the deed restrictions on the Property,
which prevented its redevelopment.  

In the letter, the attorney discloses that his firm is
representing a civic group in another lawsuit against the principal of the Country
Club.  The attorney then states, “In both
situations, our client’s goal is to stop redevelopment and retain the areas as
common use/greenspace.”  The engagement
letter was signed by the Water Authority’s president.  The Country Club asserts that this letter
reveals the Water Authority’s true reason for acquiring the Property: to
prevent redevelopment.  The Country Club
also pointed (1) to the Water Authority’s support of the legislation that makes
it more difficult to redevelop abandoned golf courses, (2) to various
statements by Branch indicating that he wanted the Property not to be
developed, (3) to Savely’s and Branch’s individual involvement with the Green
Space Committee, (4) to Savely’s proposed resolution for the Water Authority to
support the goals of the Green Space Committee, and (5) to other evidence
indicating that the Water Authority and its Board members desired to prevent
the Property from being redeveloped.  

          On appeal, the Water Authority does
not dispute that it desires to prevent the Property’s redevelopment.  We agree with the Water Authority that this
does not equate to a finding that it acted fraudulently or arbitrarily in
deciding to acquire the Property for storm water detention purposes.  A desire to stop redevelopment and a desire
to construct a storm water detention facility on the Property are not goals
that are inimical to one another.  To the
contrary, evidence at trial showed that both objectives are relevant to flood
control, an issue statutorily delegated to the Water Authority.  

The prevention of redevelopment is inherent in the
construction of the detention facility, but does not rise to an inference that such
prevention was the true purpose of the acquisition of the property.  See
Boucher v. Tex. Turnpike Auth., 317 S.W.2d 594, 600 (Tex. Civ. App.—Texarkana
1958, no writ) (noting that purpose that landowner claimed was “true” purpose
of taking was inherent in stated purpose for the acquisition of the property).  Rather, it is the purpose for which
condemnation was sought that is to be examined in resolving the question of whether
the Water Authority acted fraudulently and arbitrarily.  Wagoner, 345
S.W.2d at 763.  If the purpose is a
legitimate one, evidence that the Water Authority benefited in some other way
is not evidence that can establish fraud or arbitrariness.  See id.  

As discussed, the evidence is legally insufficient to show
that the Water Authority was unjustified in relying on Dunbar’s recommendation
to construct a storm water detention facility on the Property to address flood control
issues within the district.  The evidence
failed to negate Dunbar’s recommendation as a reasonable basis for the Water
Authority’s acquisition of the Property. 
See id.  Evidence that the decision to acquire the
Property also benefitted the Water Authority by realizing its desire to stop
redevelopment does not support the jury’s finding that the Water Authority
acted fraudulently and arbitrarily in making its decision.  See id.;
see also Circle X Land & Cattle Co., Ltd, 325 S.W.3d at 867 (concluding that
changing use of the condemned land after condemnation decision made does not
evidence that condemnor acted
arbitrarily). 

          We conclude that the
evidence admitted at trial is legally insufficient to support the jury’s
findings that the Water Authority acted fraudulently or acted arbitrarily and
capriciously in determining to acquire the Property for storm water detention
purposes.  We hold that the trial court
erred when it denied the Water Authority’s motion for judgment notwithstanding
the verdict.  Had it properly granted the
motion, the trial court would have rendered judgment permitting the Water
Authority to condemn and acquire the Property on payment of $5.1 million,
representing the fair market value of the Property, as found by the jury.  We sustain the Water Authority’s first issue in
this regard.[4]

Conclusion

          We reverse the trial
court’s judgment and remand for further proceedings to permit the trial court
to render the proper condemnation judgment in accordance with this opinion.  

 

 

                                                                   Laura
Carter Higley

                                                                   Justice


 

Panel consists of Justices Jennings, Keyes, and Higley.

 

 











[1]           Act of May 27, 2007, 80th Leg., R.S., ch. 1092, § 1,
2007 Tex. Gen. Laws 3721 (amended 2009) (current version at Tex. Loc. Gov’t Code Ann. § 212.0155
(Vernon Supp. 2010).  





[2]           Plainfield Offshore Holdings XI, Inc.
is the lien holder on the Property. 
Plainfield Offshore participated in the trial but has not filed an
appellee’s brief in this appeal.





[3]           As mentioned, the Water Authority
objected to the trial court’s definitions with respect to fraud and
arbitrariness.  The Water Authority also
argued that a higher evidentiary burden than preponderance of the evidence
applied.  The Water Authority also raises
these complaints on appeal.  We do not
address these complaints, however, because, as discussed infra, the evidence was
legally insufficient to support the jury’s findings under the charge as
given.  





[4]           Because this issue is dispositive, we
do not reach the remainder of the Water Authority’s issues presented on
appeal.